Our next case for argument is 22-2242, Lemon Bay Cove v. United States. Is it Mr. Smolker? Am I saying it right? Yes, Your Honor, you are. Okay, please proceed. Thank you, Your Honor. Your Honors, I'm Dave Smolker on behalf of the appellant, Lemon Bay Cove, LLC. I would like to reserve three minutes for rebuttal. So this is a regulatory taking case. The facts are really essentially not in dispute. Our contention is that the claims court didn't properly apply the law to those facts. And there's a couple of facts that I think are hugely important here. First, the property in question consisted of 5.64 acres of mangroves and privately owned submerged lands. In other words, 99.2% of this property was wetlands. There were no developable uplands. And it's undisputed that without a core permit, the property had no economically beneficial use. You had to have a core permit or else you had no use. But you bought the property for $15,000 at an auction, is that right? We did, and it was at a foreclosure sale. And there was a credit bid of $875,000 plus interest on the loan that had defaulted. So the $15,000 was essentially a pro forma bid under Florida law that the foreclosing mortgagee would show up and give. But anybody could have shown up and given. What if somebody had come and given $16,000? Would they have gotten the property over? No, they would have had $16,000 plus the principal and the interest. I see. Okay, but when you bought the property, you already knew that this was wetlands. Correct. You already knew that there were problems with that and that that would create a challenge for you. It would create a challenge with respect to the Penn Central taking claim on the legitimacy of investment backed expectations. But that's just one factor that should be looked at when you're evaluating investment backed expectations. It's irrelevant in the case of a Lucas taking claim. The only issue in Lucas is whether or not there was. That's categorical in Lucas. And your problem there, it seems to me, with all due respect, is that you asked the Army Corps of Engineers to approve one set of plans. And they said no to that one set of plans and asked you to discuss or talk about alternatives that would maybe not be so extensive and invasive and not require such extensive fill. And instead, you just threw your hands up in the air and said, nope, we're not going to do it. How is that a categorical taking? You were denied one set of plans. You could have come back in and asked for anything different, smaller, maybe drop the dock, maybe not go after 12 single family homes, maybe just condominiums. How does that deprive you completely, categorically, of any use of that land? Because without a Corps permit, there is no economically beneficial use. And once the Corps decided... You don't have a right to the particular permit you sought. You have a right to be able to use your property under Lucas. And you can only file a Lucas claim if you're completely deprived of that right. The Corps asked you questions that you refused to answer and made it clear that you could file another permit. You could. I mean, I don't understand. How is the denial of a single permit a categorical taking? It's a categorical taking in this particular instance because once the Corps concluded that they would not grant this permit for this particular development proposal, then the burden shifted to the Corps to tell us specifically what they would approve. Otherwise, we're relegated, essentially, to this seriatim permitting process. That might carry some weight if you had actually tried multiple times. But you tried exactly once. Lots of people apply for permits more than once. So you're right. If you had been put into some hellish version of Groundhog Day with Bill Murray, yeah, that would have been a problem. But you asked for one permit, full stop, and they said, no, not that one. But they actually threw questions back at you and asked you to consider less invasive, I don't remember the language of the question, alternatives, and to propose them. They kind of invited you to propose them, and you didn't. Right, because it was the client's conclusion that any further reductions or minimization would not achieve the economic objective that they had, which was to recover their... Your client was quite honest in telling the Corps of Engineers you had to do this in order to break even. Yes, and also... You'd lose money if you did anything else. And also to realize... And that's not the Corps' problem, is it? Well, I think it is. I think that the Corps has a duty in reviewing, I think it's Love Ladies Harbor... They don't have a duty to make you whole. Economically, right? The answer is, one of the elements that is relevant to a regulatory taking claim is the ability to recover the investment into the property. That's a factor. Is that a property right? Do I have a property right in having a return on my investment? You don't, but it is a factor that is considered under Penn Central. But you're not in Penn Central. We're focusing on Lucas now. And in Lucas, there was a complete refusal to allow any development. Those facts are just wildly different than these facts. I would agree, but Your Honor, the key point here is before they applied for a permit, they had an expectation that they should be able to get a fill for a couple of reasons. One, the prior owner had applied for and gotten a site plan approval from the county for a larger fill footprint. From the county? From the county, the local government. The local county doesn't have a statutory duty to protect the mangroves and the manatees, right? Well, in this particular instance, the answer is yes. Charlotte County, which was a relevant county, did have regulations regulating impacts to mangroves. They essentially tracked the same sort of regulations that you had under state law. Incidentally, a month before we applied in April of 2012 to the Army Corps, we received a permit from the State Environmental Wetland Permitting Agency for precisely... Just to be clear, my brilliant law clerk, who, by the way, grew up 20 miles from your site, says that that was only a preliminary approval. It came with conditions, and it didn't have a dock. And that's very true. So your client came in with the understanding that there were conditions on whether this would happen, even from the state, and it didn't have a dock, and now you're using that to say it was somehow reasonable for them to believe that the Army Corps,  and something that included a dock. First of all, we aren't contending that the Corps couldn't have put reasonable conditions on a permit. But the point is that the fill area, the impact that's being regulated by the Army Corps of Engineers, they don't regulate land use and zoning and that sort of thing. They regulate the impact that you have on wetlands. We had already gotten a preliminary approval for a similar fill footprint. We had also gotten a permit from the Water Management District for essentially the identical fill footprint. Additionally, the property is zoned and land used specifically for the residential type of development that we were proposing. And so I think in the context of a Lucas-Tayton, I don't think the owner has a burden of having to respond to the Corps and acquiesce in their requests for further reductions and minimizations. I don't have a burden to show that there is economic value remaining that was taken. In this particular instance, the economic value isn't really the test under Lucas. The test is whether there's economically beneficial use. Now, whether or not... What's going on with the land now? I know this is way outside the record, but I'm kind of curious. Did you ever at any point file another permit? I mean, anything happen? What's going on with that land? As far as I know, the client has not sought an additional permit because they basically feel that it's a catch-22. They're not going to get a permit from... They'll have to go back to the... One thing that interested me was that in your original proposal, you recognized the significance of the situation here with the mangroves, and so you, on purpose, reserved a part of the original mangrove so as not to be disturbed. Yes, what we did here... My point is, that recognition seemed to me to be in the mind. I'm talking to the regulator who wants to preserve the mangrove as that duty, so we reserved two acres or whatever it was for the mangrove. We don't know what would happen if you had come back and applied for, say, five houses, saving half of the mangroves and getting rid of the dock so that the manatee wouldn't be disturbed. Those were all theoretical possibilities, but they were speculative, and the Corps did not give us one... Speculative that you might have filed such a proposal. Speculative that the Army Corps of Engineers would have approved it. No, no, no. If you'd filed it and they turned it down, right? I suppose your main argument is that you shouldn't be made to have successive filings in order to prove that the Corps is never, like in Lucas, never going to give it to you. Precisely. In other words, we shouldn't under the Corps' permitting procedures, if they deny us, we shouldn't be obligated to engage in seriatim permitting exercises because... Tell me the question is how many times? I mean, if we had a record where you, say, asked for 12 and were turned down, then you asked for 6 and turned down, then you asked for 3 and were turned down, we might be in a different position to reach a conclusion whether you were ever going to get it. No question. However, that's not what we understand the law to be. The law is once the Corps denies the application that's in front of it, the burden shifts to them to say specifically, here's what we would approve, and then we can make an application. What case says that? What case says that, that on your first permit application, once it gets denied, the burden shifts to the government to explain what kind of permit application they would grant. Love Ladies Harbor v. U.S.? Love Ladies, there were multiple permit applications there that were denied. Isn't that right? There was certainly more than one. I don't believe so, Your Honor, but I will trust your judgment on that, but the point here is that... Well, where in Love Ladies did it say after the denial of the first permit application the burden shifts to the government to prove that it would in fact grant some permit application? I would direct you to page 157, and there is a fairly elaborate discussion where that issue is squarely raised before the claims court. What the claims court said was essentially, look, we're not going to relegate permit applicants to seriatim permitting exercises once it's determined that there is no economically beneficial use of the property and the court elects to deny a permit. No, on that page it goes on to say the plaintiffs argued the evidence established additional applications would have been futile. You have not put forth any such evidence. There's no evidence in this case that you tried more than once or that it would have been futile to try more than once with a different application. We think that the record, based on the way the court treated this permit application, they characterized those mangroves on this property as an aquatic resource of national importance and essential fish habitat, per se. And I don't see how in any set of circumstances that they would then say, but if you reduce the size of... You're arguing that the claims court judge committed clear error when she found against you on the question of whether or not they would ever give us a permit. What she said was we had failed to prove that the court would never issue a permit. And our argument is that's not our burden. Okay, let's save the rest of your time for rebuttal. Is that okay? Let's save the rest of your time for rebuttal. Let's hear from the government. Thank you. Mr. Birney? Thank you, Your Honor. May it please the court, Andrew Birney on behalf of the United States. First of all, I just want to correct the record on one thing. I'm sure it was unintentional, but my understanding and I can certainly correct the record if I'm wrong about this in the 28J, is that Mr. Smoker's client while has not submitted a formal application has come to the court with an alternative proposal. So, I just wanted to... There's no reason... It's not part of this record. It's not part of this record, so I wasn't even going to bring it up. It wasn't considered by the court below, right? No, no, no. We certainly don't need a 28J letter. Okay, fair enough. Since that statement was made. So, the CFC correctly held following a 10-day trial that the court's denial of a single permit did not qualify as a categorical taking under Lucas or taking under Penn Central. Turning first to Lucas, Chief Judge Moore, you're exactly right. This was one permit. The court denied one permit to fill two acres of high quality mangrove wetlands with an extravagant 12-town home development with a nine-slip dock. So, you think if it wasn't extravagant, they would have approved it? I think we don't know... But not extravagant. I think the court's denial of this single project does not prove that the court has denied any proposal. Just in terms of the record, I think the argument made to the court in the administrative proceedings was very different than the argument being made in the judicial proceedings. So, in the administrative proceedings, the court specifically told... This is in the January 2014 letter discussed at 11 and 12 of the appendix. The court said, you know, come forth with proposals to minimize the number of residences, to minimize the lot size, to minimize deep water impacts, to minimize the dock. And then they came back. They say this several times in the record, but I think it's shown most strikingly at page 1318 of the appendix. This is their May 2014 letter. They come forth with a laundry list of sort of must-haves. They say it has to be 12 units of equal size, it has to have deep water access, and they list a number of things. And the reason why they're so rigid about this is because they say they need to recover their investment. Which, by investment, they don't mean the relatively small amount they paid for the property, but their prior failed loan to Mr. Lefebvre. And so that was... So the court denied that one proposal. But in this court, they're saying that the court would have inevitably denied any fill proposal, but there's no support for that in the record. The court's denial of this single permit does not show that the court would have necessarily denied a different proposal, such as for a water-dependent use, a non-water-dependent use with a smaller footprint, or perhaps something else entirely, like houses built with pilings or something like that. Is there evidence that the court suggested that they file an amended application or a renewed permit application? I don't know if there's anything where they suggest they filed a renewed permit application, Judge Chen, but what I would say about that, I mean, Mr. Smolker referenced the prospect of seriatim applications. But the 404B permitting process itself, within that single process, is supposed to be an iterative process where the court where a proposal is made, the court comes back with requests to minimize, which the court did in that letter that I indicated. But that didn't happen here because Lemon Bay insisted that it had to build this specific project to recover its investment. And it's simply not the case. The one thing I want to emphasize is a Lucas claim is by its very nature an extraordinary claim. It's a complete exemption from Penn Central for the sort of extraordinary case where all economically beneficial value is extinguished by a regulation. So it is incumbent, particularly within the 404B process, for the claimant to establish that not just that a single large proposal was denied, that the court necessarily would have denied any proposal. We simply don't have that on this record. I want to say a few things about some of the approvals from the other counties. I mean, we think, first of all, that those are not relevant to the Lucas inquiry initially because, as I think Judge Clevenger indicated, these are separate entities. But on the site plan approval from Charlotte County, this was a preliminary approval from Charlotte County. This project was never submitted to the Corps. And there was testimony in the record, particularly testimony from Jamie Scudera, a project specialist, I think beginning on page 659 of the appendix, which the CFC credited as persuasive. The preliminary site plan approval is not at all difficult to get, at least in 2007 under the prior version. And Charlotte County subsequently overhauled its regulations after that site plan approval expired. So I don't think you can take anything from that. It certainly doesn't undermine... Was Charlotte County charged with administering the Clean Air Act? No. Charlotte County... Or the Clean Water Act, you mean? No, not necessarily. But the point is, they list that as part of their investment-backed expectations. And even on its own terms, they're not charged with administering the Clean Water Act. But even putting that aside, it's just not persuasive because it's not difficult to get and a revised regulatory regime, even at the local level, would have applied. As to the state approval, the state approval they received was without a DOC. The Southwest Water District specifically advised them to take the DOC out to avoid heightened scrutiny. So they did that. And I think the timing here is important. In December 2012, they received the approval from the state for a proposal that does not include a DOC. Two months later, in February 2013, they amend their application to the Corps to add a DOC. They never come back to the state of Florida to obtain approval for any sort of proposal with a DOC. And their submission to the CFC, which the CFC didn't find persuasive, is that the state of Florida would have inevitably granted them that permit with a DOC that they never sought. Just like they said that Charlotte County would have granted them final approval, which they also never sought. Okay, so we've talked about the mangroves. What about the manatees? Yeah, so that was a separate issue caused mainly by the Fish and Wildlife Service in a buyout found that would likely result in take of the endangered manatees. And specifically indicated that removal from the DOC from the proposal would alleviate that. And Lemon Bay co-declined to remove the DOC from the proposal. And am I right in remembering that the DOC would actually extend beyond what is arguably their property right and into a portion of the state property right? No, right. That's correct. Don't usually interrupt the judgment. They're throwing you a softball. Wait for it and then swing. Thank you, Your Honor. I apologize. I was a little overeager. So, no, I mean that's right. It would require a sovereign land lease from the state of Florida, which they never obtained. And under the Florida statutes, once the requirement to obtain that, it's a higher level of review from the governor and his cabinet. Is there anything else you feel like we need to cover today? No, I mean we think just on Penn Central, there's clearly no reasonable investment backed expectations here and all the other factors in favor of the government. And with that, I'll just cede the balance of my time. Thank you, Your Honor. Mr. Smolker, you have some rebuttal time. Three minutes, Your Honor. I think you have two minutes and eight seconds, but go ahead. Thank you, Your Honor. With regard to the last point, how do you square the fact that the trial court found no reasonable investment expectation in being able to fill this property because of the Army Corps' regulations with the finding under Lucas that we should have applied for lesser impactful development? I don't know how you square that. And I think that it would be helpful to hear in terms of exactly what did we have to show before we had a taking of this property under Lucas. And I would suggest to you, first of all, the denial of our permit application was with prejudice, quote unquote. They didn't say this particular permit is denied. However, if you make the following changes, we will approve it. And in fact, the testimony of the corporate representative of the Army Corps of Engineers at trial was, oh, we don't tell applicants what we will approve. We don't make specific suggestions as to what we would approve. So it puts the applicant in this position of, okay, so, you know, I think in the Supreme Court took judicial notice of the fact that the Corps permitting process is essentially extremely burdensome and the costs are inordinate. Our client in the record establishes this spent four years and $400,000 trying to get this permit. And at the end of the day, we're being told, no, sorry, you need to apply for and see whether the Corps will approve some undefined speculative other less impactful development when we already had a permit from the state agency who regulates essentially the same things. We had the zoning. We had prior site plan approval. In other words, if we have to continually be changing with new applications, then you end up in this seriatim permitting where you're supposed to prove a negative.